# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

LOUIS P. ALBENGA,

                Plaintiff,

vs.                                    CASE NO: 2:08-cv-380-UA-SPC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

_____

## REPORT AND RECOMMENDATION[1]

       This matter comes before the Court on the Plaintiff, Louis P. Albenga's, Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on May 14, 2008. The Plaintiff filed his Memorandum of Law in Support of the Complaint (Doc. #20) on November 14, 2008. The Commissioner filed a Memorandum of Law in Support of the Commissioner's Decision (Doc. #24) on January 7, 2009. Thus, the Motion is now ripe for review.

       The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

## FACTS

### *Procedural History*

The Plaintiff filed an application for disability and disability insurance benefits on April 25, 2006, alleging an onset disability date of February 28, 2006. (Tr. 15, 93-95). The Plaintiff's claim was denied initially on August 18, 2006, and upon reconsideration on December 20, 2006. (Tr. 78-80, 83-85). The Plaintiff timely filed a Request for Hearing on January 17, 2007. (Tr. 87). A hearing was held before the Honorable Steven D. Slahta, Administrative Law Judge (ALJ) on September 19, 2007, in Fort Myers, Florida. (Tr. 15, 53-75). The Plaintiff appeared and testified at the hearing held on September 19, 2007. A Vocational Expert (VE), Nicholas Fidanza, also appeared and testified at the hearing. (Tr. 15). ALJ Slahta issued an unfavorable decision on November 30, 2007. (Tr. 12-15). The Plaintiff filed a Request for Review and a letter brief with the Appeals Council on January 4, 2008. (Tr. 7-11). The Appeals Council denied the Plaintiff's request for review on April 10, 2008. (Tr. 2-4). Therefore, the decision of the Commissioner became final. Having exhausted all administrative remedies, the Plaintiff timely filed a Complaint with this Court.

### *Plaintiff's History*

The Plaintiff was born on January 22, 1947, and was sixty (60) years of age at the time of the hearing. (Tr. 53). The Plaintiff has a college education holding an Associates Degree in Criminal Justice and a Bachelor's Degree in Business. (Tr. 53-54). The Plaintiff served in the United States Marine Corp., during the Vietnam War. (Tr. 293). The Plaintiff was critically injured and received a medical discharge under honorable conditions with the rank of corporal, E-4. (Tr. 293). As a result of his injury, the upper muscles of his arm were destroyed and utilized physical

therapy to maintain use of the arm. (Tr. 293). The Veterans Administration rated the Plaintiff 80% disabled[2], and he has sought to have that rating increased to 100%. (Tr. 293). The Plaintiff has a past relevant work history as a mortgage broker, mechanic with the United States Postal Service, an immigration inspector with Immigration and Naturalization Service (INS). (Tr. 106, 119-119).

The Plaintiff alleges disability as a result of coronary artery disease (CAD), status post percutaneous transluminal coronary angioplasty (PTCA) and stent placement, degenerative joint disease (DJD) of the right knee status post arthroscopy and total knee replacement, status post left humerus fracture with muscle atrophy and skin grafting, carpal tunnel syndrome (CTS) on the left, bilateral sensorineural hearing loss (20 CFR 404.1520©)). (Tr. 17).

### Medical and Psychological History

The medical evidence in this case is voluminous and actually begins prior to the relevant period. However, because some of this historical evidence is necessary to provide a longitudinal history, it will be included in this recitation of the medical evidence. Additionally, given the volume of medical evidence in this case and the number of doctors, the Plaintiff's history will be addressed by medical condition rather than chronologically.

### Psychological Conditions

The Plaintiff was seen by his treating physician, Dr. Angel Herera, M.D., on January 19, 2004, for chronic depression. These notes indicate that Plaintiff had been on Effexor, but the medicine was discontinued due to a lack of libido. (Tr .426). The Plaintiff was placed on Wellbutrin XR. (Tr.426). Dr. Herrera's records also indicate that during 2004, the Plaintiff was also

---

[2]The Plaintiff's 80% disability rating from the VA is as follows: 40% shoulder joint paralysis, 10% each for superficial scars and traumatic arthritis and 20% due to the condition of the upper arm. (Tr. 439).

prescribed Lexapro and Remeron and that he was also experiencing chronic insomnia (Tr. 422-425). During a visit dated August 15, 2005, Dr. Herrera wrote that the Plaintiff was experiencing chronic pain following a total knee replacement of his right knee performed in March 2005 and that he was continuing to suffer from depression even on Wellbutrin. (Tr. 400-40l). The Plaintiff continued to see Dr. Herrera during the first half of 2006, for a variety of conditions and his treatment notes for this period indicate that during that time he was on Remeron, Wellbutrin, Paxil, and Lunesta either alone or in various combinations (Tr. 381, 385, 387, 392).

On May 26, 2006, the Plaintiff saw Dr. Herrera specifically for depression and anxiety as well as arthalgias and hyperlipidemia. (Tr. 377-378). During this appointment, Dr. Herrera started the Plaintiff on Buspar for anxiety and found him to be suffering from depression at a severity level of -4. (Tr. 377). The Plaintiff reported experiencing "depressed mood - marked diminished interest of pleasure - feelings of worthlessness-lack of interest" At this time, he was on the following medications: Lunesta, Paxil, Wellbutrin and Buspar. (Tr. 377-378).

On June 29, 2006, his depression level was listed as -1. (Tr. 374). The Plaintiff reported suffering from depressed mood, marked diminished interest of pleasure, feelings of worthlessness, lack of interest, and insomnia. (Tr. 374).

On November 27, 2006, the Plaintiff presented to Dr. Herrera for a follow-up on hyperlipidemia, hypertension, ED, and depression. (Tr. 366-367). Dr. Herrera found the severity level of the Plaintiff's depression is -1. (Tr. 366). The Plaintiff was diagnosed with cluonic depressive disorder, hypertension, hypercholerolemia, and impotence. (Tr. 367).

On July 3, 2006, the Plaintiff was examined at the request of Social Security by Ann Bergin Hall, a psychologist. (Tr. 293-294). Dr. Hall noted the Plaintiff arrived on time, was well groomed

and attired in clean, casual clothes, carrying a briefcase and had a list of medications. (Tr. 293). The Plaintiff wore bilateral hearing aids and despite asking to repeat questions, related easily to the examiner and he appeared open and frank in his responses. (Tr. 293). During the evaluation, Dr. Hall found that his speech was clear and intelligible and that he responded to all questions and seemed open to them. The Plaintiff did not demonstrate any delusional or psychotic thought processes, or perceptional abnormalities. (Tr. 294). With respect to his mood and affect, Dr. Hall noted the Plaintiff to be near tears and to choke up several times during the interview. (Tr. 294). The Plaintiff acknowledged sadness, tearfulness, a sense of deep loss and despair, and anxiety. (Tr. 294). The Plaintiff reported difficulty with sleep and a decreased appetite. (Tr. 294). On a mini-mental status examination he scored 30/30, which was the expected range. (Tr. 294). The Plaintiff was oriented times three, able to name common objects, read, write, copy complex designs and recall 3 out of 3 items after being distracted. (Tr. 294). The Plaintiff's judgment and insight were deemed "good" and his impulse control was adequate for the purposes of this evaluation. (Tr. 294). Dr. Hall's diagnostic impressions were on the DSM IV Axis I diagnosis "Major Depressive Disorder, single mild to moderate." (Tr. 294). The Plaintiff was found capable of managing his own funds. (Tr. 294). Dr. Hall gave him the names of four local psychologists for follow up. (Tr. 294).

On October 12, 2006, the Plaintiff was evaluated by Dr. Ricardo B. Rivas, Ph D, a psychologist, at the request of the Social Security Administration. (Tr. 356). Dr. Rivas stated he had significant experience treating and evaluating veterans throughout his career. (Tr. 356). Based upon his experience, Dr. Rivas stated the Plaintiff met the necessary DSM IV standards for Post Traumatic Stress Disorder (PTSD), chronic type, and displays the standard behaviors. (Tr. 356). Dr. Rivas based his diagnosis on Plaintiff's history and symptoms. (Tr. 356).

Since the Plaintiff was a veteran, he received much of his care through the Veteran's Administration (VA) health care system. In July 2006, the Plaintiffs Depression Screen was positive, as was his PTSD screening with him answering all four PTSD screening questions "yes". (Tr. 452). The Plaintiff was examined by Dr Theodore Bonstedt, with the VA. Dr. Bonstedt's notes reflect that the Plaintiff told Dr. Bonstedt that he had PTSD symptoms for a number of years and had been able to work through them, but that they had gotten progressively worse over the last two years. (Tr. 439). The Plaintiff reports uneasy feelings regarding the news footage from Iraq. (Tr. 440). The Plaintiff had turned down a mental health consult in 2005, the Plaintiff told Dr. Bonstedt that he wanted to amend his VA disability application to include a claim for PTSD. (Tr .440). The Plaintiff reported to Dr. Bonstedt that he had never had any psychiatric hospitalizations, but had been on psychotropic medications which initially helped him deal with his anger and irritability. (Tr. 440). The Plaintiff also related that he had started seeing a psychologist, but that it was not helping. (Tr. 440). The Plaintiff told Dr. Bonstedt that in retrospect he realized that his personality had changed

since he had returned from Vietnam including increased irritability, avoidance of crowds, sleep disturbances and flashbacks. (Tr. 440). However, when he was working, he used "Marines discipline," to deal with these problems. (Tr. 440). Although he stated that medication initially helped his condition slightly, his condition had returned to where they had been one year earlier and seemed to coincide with the Iraq war news. (Tr. 439-440). While the Plaintiff admits to have self medicated with alcohol several years ago, the Plaintiff had stopped on his own and had not had a drink in over two (2) years. (Tr. 440). The Plaintiff also had started meeting on an irregular basis with other Vietnam veterans and they shared experiences which seemed to help him. (Tr. 441).

In terms of objective findings, Dr. Bonstedt noted that the Plaintiff had been exposed to enemy fire on a daily basis and that during one conflict 60% of his battalion was wounded including himself. (Tr. 441). Dr. Bonstedt also found that Plaintiff experienced a second serious traumatic event when, while working as a police officer in New York, he tried to prevent a lady from committing suicide and as soon as she saw him (a uniformed officer), she jumped and committed suicide. (Tr. 441).

With respect to his mental status examination, Dr. Bonstedt found the Plaintiff's speech to be rapid and intense, but that his affect was neither anxious nor depressed. The Plaintiff's thought processes were goal oriented, he denied hallucination, suicidal ideations and mood swings, but did confess that he worried too much. (Tr. 442). Dr. Bonstedt concluded that, although his condition did not impair his employment while working, it created anguish and has gotten worse since his heart attack. (Tr. 442). The diagnosis was PTSD and alcohol abuse in long term remission. (Tr. 442). Dr. Bonstedt placed his current Global Assessment of Functioning (GAF) at 60, indicating moderate difficulty in social and occupational functioning. (Tr. 442). Dr. Bonstedt concluded that the Plaintiff's physical problems would justify leaving the workforce, but that his mental condition alone would not prevent him from working, and his overall outlook might be improved if he could avail himself of psychiatric treatment (Tr. 443).

There are two Psychiatric Review Technique Forms (PTSF) completed by non-examining state examiners in the record. One was completed by Theodore Weber, Psy.D on August 18, 2006. (Tr. 310-323). In his PRTF, Dr. Weber noted that the Plaintiff had an Affective Disorder and Anxiety Related Disorders, but neither were "severe". (Tr. 310-323). Dr. Weber found a depressive disorder not otherwise specified and an anxiety state, not otherwise specified (Tr. 313,

315). Dr. Weber also found "mild" restrictions in the Plaintiff's ability to maintain the activities of daily living and mild difficulties in maintaining concentration, persistence or pace. (Tr. 320). The second PRTF is both undated and unsigned. (Tr. 324-337). However, the person completing the form also found a non-severe depressive disorder with mild restrictions in the activities of daily living and "mild" difficulties with concentration. (Tr. 324-337).

*Bilateral Hearing Loss*

The Plaintiff's hearing loss is documented in the VA records. The Plaintiff was seen in 2005 for a progressive bilateral sensorineural healing loss over the preceding year. A hearing test performed on August 22, 2005, revealed that the Plaintiff had a bilateral healing loss. (Tr. 467). The hearing loss was believed to be related to exposure to noise and his former occupation as a law enforcement officer and his military service. (Tr. 468). In a report signed by LeeAnn Hinds, an audiologist, she noted that there was no possibility of a change in the Plaintiff's hearing at the threshold levels. (Tr. 469). Despite his hearing problems, his speech recognition scores were good. (Tr. 469). The Plaintiff was issued bilateral digital hearing aids for his hearing deficit (Tr. 479).

*Cardiac Problems:*

The Plaintiff has a history of heart problems. In February 18, 2003, the Plaintiff underwent a cardiac stress test where he was diagnosed as having a right bundle branch block. At this time, his ejection fraction was 61% and considered normal. (Tr. 233). On February 28, 2006, the Plaintiff was admitted to the emergency room at Naples Community Hospital complaining of a sudden onset of left sided chest pain. (Tr. 278). The Plaintiff experienced this attack at work. (Tr. 278). The attack began with very intense pain and a feeling of pressure on his left upper body. The pain fluctuated from dull to episodes of sometimes very sharp and severe and intense pain. (Tr. 278). In

addition to the chest pain, the Plaintiff experienced shortness of breath.  (Tr. 278).  During the attack he tried Nitroglycerin which provided slight but insufficient relief for his pain. (Tr.  278).

Physical examination revealed that palpation of the chest along the mid-clavicle  line at the level of the ribs mildly recreated the pain, but that the pain seemed to be more lateral pain.  An electrocardiogram was taken and compared with an older EKG.  While both revealed a light bundle branch block, there did not appear to be any change between the older EKG and the current one. Diagnostic testing, including X-rays and a CT scan of the chest both failed to reveal any acute process (Tr. 279, 281, 282).  The Plaintiff was given a dose of Dilaudid, however, the Plaintiff still complained of pain.  (Tr. 279).  Given the Plaintiff's continuing pain, the ER doctor in consultation with Dr. Herrera  decided to admit the Plaintiff with a diagnosis of acute chest pain.  (Tr. 279).

On April 12, 2009, a myoview scan (a diagnostic test where a small amount of radioactive dye is given to the patient and a camera tracks the blood flow) was abnormal.  (Tr. 279).  On April 11, 2006,  Dr. Califano performed a cardiac catheterization on the Plaintiff and he was found to have high grade disease with 95% stenosis of a small ramus intermedius, his right coronary artery  had a 30% proximal lesion and a 40% mid lesion with no high grade disease.  (Tr. 286).  During this procedure, Dr. Califano inserted a stent into the Plaintiff's artery.  (Tr. 289).

Dr. Rabinowitz, M.D, who evaluated the Plaintiff at the request of the Social Security Administration, saw the Plaintiff after his stent placement and wrote that the Plaintiff had "done well, but that he still complains of chest pain throughout the day as well as a lack of energy.  (Tr. 295).  Dr. Rabinowitz also noted that the Plaintiff had been told that some of his chest pain may be related to stress and anxiety.  (Tr. 295). With respect to his cardiac and cholesterol problems, the Plaintiff was taking Norvasc, Vytoren, Plavix and a Bayer aspirin, but no nitroglycerin (Tr. 295).

Upon physical examination, there were no heart murmurs detected, but it as noted that Plaintiffs heart sounds were distinct. (Tr. 297).

<em>Knee Problems</em>:

The Plaintiff also has a history of knee problems. In June 2003, the Plaintiff underwent an arthroscopic procedure on his right knee for a lateral meniscus tear and moderate compartmental osteoarthritis. (Tr. 216). These diagnoses had been identified through both x-ray and MRl imagining. (Tr. 216). While operating. Dr. Dounchis, M.D., found a complex degenerative tear of the lateral meniscus and the entire meniscus "dysfunctional", and he removed it. (Tr. 217). Dr. Dounchis also noted severe chondromalacia in the right knee. (Tr. 217).

The Plaintiff presented to see Dr Beltram, M.D., on December 22, 2003, for continued knee pain and a second opinion. (Tr. 244). Upon examination, the right knee shows 9 degrees of measures valgus with the patient supine. (Tr. 244). The Plaintiff had some medial pain along the MCL. (Tr. 244). X-rays of the knee consist of a flexion weight bearing view as well as three other views show that the Plaintiff has Grade IV lateral compartment arthritis. (Tr. 244). The Plaintiff was diagnosed with lateral compartment arthritis, right knee. (Tr. 244).

On January 9, 2004, the Plaintiff returned to Dr. Bertram. (Tr. 243). A knee brace was recommended for Plaintiff but he did not obtain it due to expense. (Tr. 243-245). Dr. Bertram gave the Plaintiff three choices regarding treatment for his knee pain: 1) osteotomy of the distal femur; 2) unicompartmental knee; 3) total knee replacement. (Tr. 243). The Plaintiff was doing better on anti-inflammatories and diet supplements. (Tr. 243).

On November 15, 2004, the Plaintiff met with Drs. Herrberg and Bernam to discuss his continued knee pain and his options for the future. (Tr. 242). Dr. Herrberg and the Plaintiff

10

determined the best option was a total knee replacement. At the conclusion of this appointment, the Plaintiff received a cortisone injection (Tr. 242).

On March 18, 2005, Dr. Howard Kapp, performed a total knee replacement on the Plaintiff's right knee. (Tr. 276). During follow-up appointments, Dr. Kapp noted that the Plaintiff continued to complain of knee pain even after his total knee replacement. (Tr. 376). As part of the follow up, the Plaintiff underwent numerous imaging studies of his right knee. (Tr. 376, 396). These studies demonstrated that his knee prosthesis was in the correct position and that 'his x-rays have always looked good." (Tr. 376, 396). In the wake of these imaging studies and his observations of the Plaintiff; Dr. Kapp concluded that the Plaintiff was part of a very small percentage of patients who after undergoing total knee replacement continue to experience pain. (Tr. 376). During his consultative examination, Dr. Rabinowitz also found the Plaintiff to have both pain and crepitus in his right knee as well as the fact that it was enlarged. (Tr. 297).

On October 8, 2005, Dr. Kapp completed a Physical Capacity Evaluation questionnaire in which he answered that the Plaintiff could only stand and/or walk for 2 hours at a time for a total of 4 hours in an eight hour day. (Tr. 372). Dr. Knapp opined that the Plaintiff could sit three hours at a time for 8 hours during an 8 hour day. (Tr. 372). The Plaintiff could lift up to 20 pounds frequently and up to 50 pounds occasionally. (Tr. 372). The Plaintiff could use his hands for repetitive grasping, pushing, pulling and manipulation. (Tr. 372). The Plaintiff could also use his feet for repetitive movements and could occasionally bend, squat, crawl and climb. (Tr. 373). The Plaintiff also noted that the Plaintiff could reach above shoulder level (Tr. 372-373). In a pain questionnaire completed the same day by Dr. Kapp, he stated that Plaintiff suffered from constant pain post total knee replacement and that the Plaintiffs complaints of post surgical pain were credible

(Tr. 371).

## *Left Shoulder and Hand Problems*

The Plaintiff was wounded in his left aim during combat in the Vietnam War in 1967. (Tr. 62-63). Notes from the VA hospital list that injury as left deltoid injury· (Tr. 445-446). X-rays reveal that the injury caused a broken humerus which is now healed. The Plaintiff has complained of continuous pain in his left elbow and arm (Tr. 445-446). During his testimony at the hearing, the Plaintiff complained of not only knee pain, but also of chronic shoulder and arm pain in his left shoulder. The Plaintiff also testified that he had begun to drop things and experience numbness in his left arm. (Tr. 72).

On November 14, 2006, Dr. William Justiz found that the Plaintiff had weakness and numbness in his left arm as a result of his war injury. (Tr. 498). With respect to clinical evidence, the evidence was mixed, although Plaintiff had normal grip strength on several examinations. (Tr. 498). Dr. Justiz' findings indicated diminished pinprick sensation in the first three digits of the left hand. (Tr. 498). The Plaintiff was also diagnosed with Carpal Tunnel Syndrome, left greater that right and prescribed a brace for his left wrist. (Tr. 498).

## *State Examiner*

The Plaintiff's medical records were reviewed by Dr. Gary Cartel, a state agency doctor and Physical Capacity Evaluations (PCE) were completed. Dr. Cartel found that the Plaintiff could stand/walk 6 hours and sit 6 hours in all eight hour day. He indicated that the Plaintiff could lift 20 pounds occasionally and 10 pounds frequently. (Tr. 349). The only other limitations for the Plaintiff were that he could only occasionally engage in climbing, use ramps, climb stairs, and use ladders. (Tr. 303-309).

*Administrative Law Judge's Decision*

Upon consideration of the evidence, the ALJ found the Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2011. (Tr. 17). The ALJ found the Plaintiff has not engaged in substantial gainful activity since February 28, 2006. (Tr. 17). The ALJ concluded the Plaintiff has the following severe impairments: coronary artery disease (CAD), status post percutaneous transluminal coronary angioplasty (PTCA) and stent placement, degenerative joint disease (DJD) of the right knee status post arthroscopy and total knee replacement, status post left humerous fracture with muscle atrophy and skin grafting, carpal tunnel syndrome (CTS) on the left, and bilateral sensorineural hearing loss (20 CFR §404.1520©)). However, the Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20CFR 404.1520(d), 404.1525, and 404.1526). (Tr. 23). The ALJ concluded, after careful consideration of the entire record, the Plaintiff had the residual functional capacity to perform the full range of sedentary work. (Tr. 23). The ALJ noted the Plaintiff is capable of performing past relevant work as a mortgage broker. The work does not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity. (Tr. 35). Therefore, the Plaintiff was found to have not been under a disability, as defined in the Social Security Act from February 28, 2006, through the date of the ALJ's decision. (Tr. 35).

## THE STANDARD OF REVIEW

### A. **Affirmance**

The scope of this Court's review is limited to determining whether the ALJ applied the

correct legal standards, and whether the findings are supported by substantial evidence. Hibbard v. Commissioner, WL 4365647 *2 (M.D. Fla. December 12, 2007) (citing Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); McRoberts v. Bowen, 841 F. 2d 1077, 1080 (11th Cir. 1988)). In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations[3]. 20 C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Hibbard, WL 4365647 *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v.

---

[3]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:
*Step 1.* Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.
*Step 2.* Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.
*Step 3.* Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled. If not, the next question must be resolved.
*Step 4.* Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not, the ALJ must answer the last question.
*Step 5.* Can he or she engage in other work of the sort found in the national economy? If so, then the claimant is not disabled. If the claimant cannot engage in other work, then he or she is disabled. See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

Barnhart, 357 F. 3d 1232, 1240 n. 8 (11th Cir. 2004). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Phillips, 357 F. 3d at 1240 n. 8; Dyer v. Barnhart, 357 F. 3d 1206, 1210 (11th Cir. 2005). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

**B.  Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Williams v. Commissioner, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Thomas v. Barnhart, WL 3366150 *3 (11th Cir. December 7, 2004) (citing Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993)). The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Johnson v. Barnhart, 268

F. Supp. 2d 1317, 1321 (M.D. Fla. 2002) (citing <u>Jackson v. Chater</u>, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996)).

"To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim." <u>Johnson</u>, 268 F. Supp. 2d at 1321; <u>Jackson</u>, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); <u>Davis</u>, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). "Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision." <u>Johnson</u>, 268 F. Supp. 2d at 1321 (citing <u>Falcon v. Heckler</u>, 732 F.2d 827, 830 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain the his basis of his decision)).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. <u>Johnson</u>, 268 F. Supp. 2d at 1321; *See* <u>Diorio v. Heckler</u>, 721 F.2d 726, 729 (11th Cir. 1983)(finding the Court may at any time order additional evidence to be taken before the Secretary upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding); *See* <u>Reeves v. Heckler</u>, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. <u>Jackson</u>, 99 F.3d at1095; <u>Johnson</u>, 268 F. Supp. 2d at 1321.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). "To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level." Green v Commissioner, 2007 WL 4287528 * 3 (M.D. Fla. Dec. 4, 2007) (citing Jackson, 99 F.3d at 1090 - 1092; *See also* Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994)). With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[4] Id.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

---

[4]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. Jackson, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. Id. In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. Id.

42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## DISCUSSION

The Plaintiff states the case should be remanded to the Commissioner due to the following errors: (1) the ALJ failed to find Plaintiff's psychological impairments to be severe; (2) the ALJ failed to properly evaluate Plaintiff's pain (3) the ALJ failed to assign appropriate weight to the opinions of the treating sources in this case; and (4) the ALJ's failure to explore the requirements of Plaintiff's past relevant work and his questions to the VE were incomplete. The Government replies that substantial evidence supports the Commissioner's findings that Plaintiff was not disabled and could perform his past relevant sedentary work.

### *(1) Whether the ALJ Properly Found the Plaintiff's Mental Impairments to be Non-Severe*

The Plaintiff argues the ALJ failed to find that Plaintiff had a severe mental impairment and in fact cites to the ALJ's decision in which he states that Plaintiff had "no severe mental impairments." (Tr. 4). The Commissioner argues that contrary to the Plaintiff's contentions, substantial evidence supports the ALJ's finding that he did not have a severe mental impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1520(c). "An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, regardless of age, education, or work experience." Bridges v. Bowen, 815 F.2d 622, ;625 (11th Cir. 1987).

At step two of the sequential evaluation process, the ALJ found that Plaintiff has the following severe impairments: coronary artery disease (CAD) status post percutaneous transluminal coronary angioplasty (PTCA) and stent placement, degenerative joint disease (DJD) of the right knee post arthroscopy and total knee replacement, status post left humerus fracture with muscle atrophy and skin grafting, carpal tunnel syndrome (CTS) on the left, and bilateral sensorineural hearing loss. (Tr. 17). Therefore, the ALJ found in favor of the Plaintiff at step two of the process.

In reasoning that Plaintiff did not suffer from severe mental impairment, the ALJ first examined the Plaintiff's hearing testimony where he testified that he is disabled in part due to depression with mood swings and crying spells and his ability to concentrate and deal with people has changed. He saw a psychologist for about 6 months but stopped treatment about 6 months prior to the date of the hearing because he was embarrassed by it. (Tr. 18). The ALJ cites that Plaintiff was evaluated for PTSD at the VA, but he was unaware of the outcome of the testing. The ALJ pointed out that Plaintiff testified he had difficulty sleeping because he has a lot of things on his mind such as his inability to work, his father's health, and what to do with himself since he never had a hobby. He feels he cannot maintain concentration sufficiently to return to his past work as a mortgage broker. (Tr. 18). In contrast, the ALJ cited Dr. Herrera's notes of March 27, 2006, which indicate that Plaintiff told the doctor his anxiety was intermittent. The ALJ states:

> Dr. Herrera stated the anxiety was moderate in severity with no associated symptoms and there were no pertinent negatives. A trial of Lunesta was added at that visit for insomnia and Paxil was added. The claimant initially complained of depression to Dr. Herrera on May 26, 2006, when Paxil was changed to Buspar due to adverse side effects. Dr. Herrera assessed the claimant's depression at that visit as level 4 in severity. (Tr. 18).

The ALJ points out that Plaintiff complained of depressed mood, diminished interest or pleasure, and feelings of worthlessness, but Dr. Herrera stated there were no symptoms of weight

gain/loss, insomnia/hypersomnia, psychomotor retardation/agitation, fatigue, diminished concentration, low self-esteem, social phobia, etc. The ALJ further pointed out from Dr. Herrara's notes that Plaintiff's symptoms remained the same on June 29, 2006, but the Plaintiff stated the Buspar was helping, therefore, it was continued and Wellbutrin was increased. (Tr. 18).

The Plaintiff's statements on his disability report of June 27, 2006, indicate he began having anxiety attacks a few years ago. The Plaintiff stated the anxiety attacks could last a few days to a week at a time and they were precipitated by chronic pain. He would experience shortness of breath, chest pressure, pounding heart rate, poor concentration, withdrawal and irritability. (Tr. 18). The ALJ discounts these statements, however, by indicating "These symptoms are inconsistent with those the claimant reported to Dr. Herrera in 2006." (Tr. 18).

Although in 2005, the Plaintiff's records from the VAMC indicate having uneasy feelings when he saw the news from Iraq, the Plaintiff declined a mental health consult. No mention of depression/anxiety was made at the VA again until July 6, 2006, when an LPN assessed the Plaintiff in a routine follow-up exam. The nurse stated the Plaintiff was alert and oriented but his depression screening was considered positive due to his reports of nightmares or thoughts about past experiences and his feelings of being constantly on guard, watchful, or easily startled. The ALJ noted that "the doctor who examined the claimant after the nurse's screening recommended no treatment based upon these reported symptoms." (Tr. 18).

The ALJ points to Dr. Hall's consultative evaluation of the Plaintiff on July 3, 2006, after his reports of depression and anxiety for which he was taking Wellbutrin, Buspar and Lunesta. (Tr. 19). The ALJ notes the Plaintiff denied any history of mental health treatment in his lifetime and stated he was independent with his personal hygiene, he drove a car, performed some household

chores, and visited with his parents regularly. Although, he reported poor sleep, diminished appetite and loss of pleasure in activities. (Tr. 19). Dr. Hall found the Plaintiff to be physically fit and tanned and scored him on a mini mental status exam of a 30/30 which was in the expected range. He had good judgement and insight and his concentration was adequate. However, Dr. Hall noted the Plaintiff appeared to be near tears several times during the evaluation and, therefore, diagnosed major depressive disorder, single episode, mild to moderate. (Tr. 19).

The ALJ notes that Plaintiff completed a function report on August 4, 2006, in which he stated that:

> his activities included "walking and reading for pleasure, doing laundry, loading the dishwasher, independently performing daily hygiene and grooming, feeding and brushing the cat, changing the litter box, vacuuming, watering plants, trimming bushes, riding a bicycle, shopping for groceries for an hour at a time, driving and watching television." (Tr. 19).

The ALJ further points out that Plaintiff stated he could "lift and carry 10-20 pounds, sit or stand for 60 minutes, and walk approximately 15-30 minutes at a time." (Tr. 19). However, the Plaintiff also pointed out he could not kneel, bend or squat, and he could only climb about 5 steps without pain." (Tr. 19). The Plaintiff had difficulty using his left hand due to his war injury and had difficulty completing tasks and concentrating due to the pain. Although, he could follow written and spoken instructions, he got along well with authority figures, and hhe andled changes in routine well. (Tr. 19).

Just one day after his function report, Dr. Rabinowitz consultatively examined the Plaintiff. His complaints were of CAD and joint pain. He reported episodes of chest pain and tightness not particularly related to exertion or emotional distress. He continued on Buspar, Lunesta, and Wellbutrin. The ALJ pointed out that Dr. Rabinowitz noted the claimant was "fully oriented and

his memory was intact. His behavior was appropriate and he related adequately during the exam. Dr. Rabinowitz diagnosed physical impairments as well as history of mild anxiety and depression, treated." (Tr. 19).

The ALJ notes that Dr. Rivas also consultatively evaluated the Plaintiff on October 12, 2006. The Plaintiff was still taking his medications for his physical impairments. He complained of having difficulty sleeping due to dreams and that he avoided people and places that prompted traumatic recollections. The ALJ specifically points out that Dr. Rivas noted the Plaintiff's affect "was appropriate and his mood was moderately anxious. His thought process was logical and he was fully oriented. He had no difficulty with memory or calculations." (Tr. 20). The ALJ further pointed out that Dr. Rivas assessed the Plaintiff's intellectual functioning as "above average." (Tr. 20). Dr. Rivas diagnosed chronic PTSD and a global assessment of functioning (GAF) score of 60 at the time of the evaluation and 70 being the highest level during the past year. (Tr. 20).

The ALJ points to Dr. Justiz' notes of November 14, 2006. The Plaintiff told Dr. Justiz, his treating neurologist, that his mood had been okay and his depression was assessed as severity level 1. (Tr. 20).

On February 15, 2007, the Plaintiff followed up with Dr. Rivas. Rivas' handwritten notes state the Plaintiff's depression was moderate and he reported that he was sleeping OK. Also in February, the Plaintiff told Dr. Califano, that although he was suffering from anxiety due to the stress of his job and trying to get disability, he was continuing to exercise vigorously with weight lifting, biking and using the treadmill, without difficulty. (Tr. 20).

The ALJ points to the notes of Dr. Bonstedt, a VA psychiatrist who evaluated the Plaintiff on March 5, 2007, in connection with his claim for service-connected benefits for PTSD. (Tr. 20).

The ALJ notes the Plaintiff stated he had only one post-military traumatic event which was in 1974 while working as a policeman. However, in the past 1 ½ years his symptoms had increased since becoming unemployed and watching the news from Iraq. (Tr. 20).

The ALJ cited Dr. Bonstedt's note that the Plaintiff had previously declined mental health treatment at the VA but amended his claim on December 18, 2006 to include PTSD. (Tr. 20). The Plaintiff denied hospital mental health treatment but reported he had been taking psychotropic medications for about 3 or 4 years. The medications had helped him be more patient and less angry/irritable. (Tr. 20). Although the Plaintiff said he had occasional flashbacks, but no bad dreams or nightmares, he had difficulty staying asleep, and avoided crowds and had no friend, he stated the symptoms had improved slightly with medication but were becoming gradually worse due to the recent war news. (Tr. 20). The Plaintiff told Dr. Bonstadt that he went to the gym 3 or 4 times per week, read a book every 3 or 4 days, and never had suicide ideations, and denied mood swings, delusions and hallucinations, but admitted to worrying too much. (Tr. 21). Dr. Bonstedt concluded that the Claimant's affect was appropriate and he had no memory impairment. In fact his Diagnoses was PTSD and alcohol abuse in long term remission. His GAF score was assessed as a60, moderate. (Tr. 21). The ALJ pointed out that contrary to the Plaintiff's reports to Dr. Bonstadt, on May 3, 2007, the Plaintiff told Ruth Bishr, ARNP at the VA that his PTSD was stable with Wellbutrin and he had no significant symptoms at that time. (Tr. 21)

The ALJ summed up his conclusion by stating:

> The claimant's reported symptoms at the hearing of mood swings and crying spells are inconsistent with his reports to Dr. Herrera, Dr. Rivas and the other treating and consulting sources, as well as the objective, clinical findings by these sources which show his symptoms of depression, anxiety and/or PTSD are not severe. At times the claimant has related his symptoms of anxiety and depression to chronic pain and at other times he has related them to his

23

war experiences or stress of applying for disability benefits. Dr. Herrera's 2006 records show the claimant reported his symptoms of anxiety/depression were intermittent and that medications helped. The claimant declined mental health treatment at the VA in 2005 and until later in 2006 when he applied for service connected benefits due to mental impairment. In June 2006 he reported symptoms of thoughts of his war experiences, but the doctor recommended no other treatment than continuing with medications prescribed by Dr. Herrera. The claimant reported more severe symptoms during a consultative evaluation with Dr. Rivas in October 2006 including bad dreams, hyper vigilance and social avoidance, but these symptoms are inconsistent with those alleged to Dr. Herrera in November 2006. Dr. Rivas found the claimant's only objective symptom during that evaluation was moderately anxious mood. He had no difficulty with memory, thought processes or calculations.

The ALJ noted, "Dr. Rivas assessed a GAF of 60 with 70 during the past year. According to the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV 34 (4th ed., text revision 2000), a GAF of 51 through 60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF of 61 through 70 represents mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships."

Contrary to the Plaintiff's argument, the ALJ gave great weight to the assessment of mild symptoms by the examining source as it is consistent with the records from the Plaintiff's treating sources, other consulting sources, and the Plaintiff's wide range of daily activities. The ALJ further noted that it is also consistent with the Plaintiff's reported improvement to Dr. Herrera in November 2006 to the extent that he stopped taking Buspar and Dr. Herrera found he had no severe symptoms.

The ALJ further states that:

it is consistent with the Plaintiff's report to Dr. Rivas in February 2007, that he was sleeping well and there were no reports of nightmares or flashbacks. The assessment of mild limitation of mental functioning is consistent with the claimant's lack of treatment for mental impairment. The claimant told Dr. Bonstedt in March 2007, that he had seen a psychologist for 6 months and he

testified at the hearing in September 2007, that he had stopped seeing a psychologist about 6 months previously, or around March 2007, but there are no records from Dr. Rivas other than the consult in October 2006, and the one visit in February 2007. There are no treatment records in the evidence from any other psychologist. (Tr. 22)

Furthermore, the ALJ pointed to other inconsistencies in the record for finding the Plaintiff did not suffer from a severe mental impairment. Specifically, he noted:

the Plaintiff told Dr. Bonstedt in March 2007 that he had not experienced symptoms of PTSD when he was busy working. Medications had improved his anger and irritability. He reported difficulty staying asleep, which is inconsistent with what he told Dr. Rivas in February 2007. ...[H]is only other complaint was of worrying too much. The Plaintiff's alleged symptoms of difficulty with concentration and memory are inconsistent with his hobby of reading a book every 3 or 4 days. His alleged mental impairments have not interfered with his ability to visit with family and friends, perform household chores or workout regularly at home or in a gym. (Tr. 22).

The ALJ gave less weight to the GAF assessments of 60, or moderate symptoms and limitations, made by Dr. Rivas and Dr. Bonstedt because they were made after one consultative evaluation. (Tr. 22); *See* Huhn v. Astrue, 2009 WL 804646 *12 (M.D. Fla. March 26, 2009) (holding the opinion of a one time consultative examiner is not accorded the same weight as the opinion of a treating physician). The ALJ further found these assessments "appear based upon the claimant's reported symptoms at the time and they are inconsistent with the claimant's reports to his treating doctor, his treating doctor's findings, and the claimant's daily activities." (Tr. 22). The ALJ may properly discount a physician's opinion if it is not supported by or is contrary to medical evidence in the record. Morrison v. Barnhart, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003). Thus, the ALJ supported his finding that the Plaintiff's psychological impairments were not severe by substantial evidence in the record. Therefore, these findings will not be disturbed.

## (2) Whether the ALJ Failed to Properly Evaluate Plaintiff's Pain

The Plaintiff argues in his brief (Doc. #19, p. 16) the ALJ failed to properly evaluate Plaintiff's pain. The Commissioner argues the ALJ properly evaluated the medical opinions of record.

Pain is a non-exertional impairment. Phillips v. Barnhart, 357 F.3d 1232, 1243 n. 11 (11th Cir. 2004). Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g. medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard." Foote, 67 F.3d at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

The ALJ noted that "because a claimant's symptoms can sometimes suggest a greater level

of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529 describes the kinds of evidence the ALJ must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements."[5] The ALJ then made a detailed decision taking into account the Plaintiff's daily activities, his back pain, knee pain and pain in his upper extremities including his left arm and hands.

The ALJ cites to the Plaintiff's hearing testimony as follows:

> The Plaintiff stated he is "disabled due to a heart attack in February 2006, as well as left arm impairment, right knee pain following arthroscopic surgery in 2004, and total knee replacement in 2005." (Tr. 25). His left arm was shot above the elbow and below the shoulder in 1967 in Vietnam. He stopped working in February 2006 following a heart attack and he had stent placement a few months later. He has shortness of breath with walking fast or climbing stairs. He has chest pain occasionally with anxiety. The only thing he can do for his heart is try to eat right and take medication for cholesterol, but the medication makes him fatigued.... His left arm pain has increased during the past 2 years at the site of his wound and he has constant pain in that area at the level of 9-10. He has difficulty raising his left arm for any length of time and it affects his ability to lift and carry. For the past 2-3 years, he has dropped things with the left hand. His left thumb and forefinger tingle and his left fingers are always cold. He has less feeling in the left fingers than the right. His left arm condition is not going to get better and the only treatment he receives for it at the VA is pain pills. The claimant testified that he has constant right knee pain which worsens with driving more than 15 minutes at a time or sitting more than 15-20 minutes at a time. Standing helps him stretch out his leg, but he cannot stand more than 45 minutes at a time. The pain radiates from his knee down to the calf and up to the buttock. He can bend from the waist, but he has difficulty in kneeling.

---

[5](1) The claimant's daily activities; (2) The location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p) (Tr. 24).

No further knee surgery has been suggested. He never returned to full duty work following his knee replacement surgery. He takes hydrocodone for pain.

The claimant reported that he reads a lot and goes to bookstores often. He can read a book in 3 - 4 days and he can concentrate on what he is reading. He rides a regular, outdoor bicycle for knee therapy and rides 1- 1 ½ to 2 miles at a time but he gets tired. He tries to work out lifting weights to strengthen his upper body and use ankle weights, but it is difficult with only 1 good arm. He has not taken a trip. He has been concerned about his father for the 3 -week period prior to the date of the hearing...The claimant stated he put his father in a nursing home after his discharge [from the hospital]. He walks the 1-mile distance to the nursing home to visit him.

After considering the evidence of record, the ALJ found "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 25). The ALJ then proceeds to support this conclusion with 9 pages of record evidence that contradicts the Plaintiff's assertions. (Tr. 25-34).

### Daily Activities

The ALJ reviewed the physical capacity evaluation questionnaire Dr. Kapp filled out on October 8, 2006. Dr. Kapp stated "the claimant could stand an/or walk 2 hours at a time and a total of 4 hours during an 8-hour workday. He could sit 3 hours at a time and a total of 8 hours in an 8-hour workday. He could frequently lift 11-20 pounds and occasionally 21-50 pounds. He could use his hands for repetitive grasping, pushing, pulling, and fine manipulation. He could use his feet for repetitive movements. He could occasionally bend, squat, crawl and climb. He could reach above shoulder level. On that date, Dr. Kapp also completed a pain questionnaire in which he stated he had treated the claimant since February 2005. The claimant has chronic pain following total knee replacement." (Tr. 29).

Dr. Califano examined the Plaintiff on February 19, 2007, where the Plaintiff reported he continued to exercise vigorously without angina or dyspnea. The Plaintiff had been lifting a lot of weights, biking and using a treadmill without problem, but he complained of ache in his chest. Dr. Califano stated the claimant "had excellent exercise capacity and negative myoview. His blood pressure was under good control and medications were continued (Exhibit 12F).

The ALJ points out the Plaintiff had stent placement in February of 2006. In April 2006, the Plainitff denied all cardiac-related symptoms and his exam findings were normal. The Plaintiff denied having chest pain to Dr. Herrera in June 2006, and the VA in July 2006. The Plaintiff denied having any chest pain or other cardiac symptoms to Dr. Califano in October 2006, and reported riding a bicycle 10 miles per day. The Plaintiff also denied cardiac symptoms in November of 2006 to Dr. Justiz and told him he used the treadmill and bicycle 3 to 5 times per week. His EKG was normal in December 2006. (Tr. 31). The Plaintiff told Dr. Califano in February 2007 that he continued exercising vigorously without angina and results of treadmill testing were considered normal. The Plaintiff had excellent exercise capacity according to Dr. Califano. He denied chest pain at the VA in May 2007. (Tr. 32).

The ALJ specifically points out that:

> At the hearing in September 2007, the claimant testified that he has shortness of breath with walking fast or climbing stairs and he has chest pain occasionally, which he attributed to anxiety. He stated that he gets tired after riding a bicycle 1 - 1 ½ miles, but he also lifts weights and works out. He walks 1 mile to visit his father. (Tr. 32).

The ALJ concludes that the "claimant's allegations at the hearing of cardiac symptoms related to exertion are inconsistent with the objective, clinical findings of excellent exercise capacity and they are inconsistent with his reports of no symptoms to his treating sources. Records show the

claimant's CAD was successfully treated and he has been asymptomatic since April 2006." (Tr. 32).

While the performance of everyday tasks cannot be used to make a determination that the Plaintiff was not disabled, daily activities can be used as a measure of the Plaintiff's credibility in regard to his ability to perform certain tasks. *See* Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited a treating physicians testimony by pointing out the contrasts in the claimants daily activities and the physicians diagnosis); Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because of her daily activities demonstrated otherwise). *See* Norris v. Heckler, 760 1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider the plaintiff's demeanor when making a credibility determination). Thus, due to the Plaintiff's excellent exercise capacity and strenuous activities, the ALJ found that his pain complaints were simply not credible.


*Back Pain*

Regarding the issue of impairment of the spine, the ALJ found the Plaintiff "has no severe impairment of his spine." (Doc. 22). Although the Plaintiff initially complained of low back pain when he saw Dr. Bertram in March 2006, he denied any paresthesias or radiation of pain. Straight leg raising test was negative and MRI scan revealed only some minimal changes. Although an epidural steroid injection (ESI) was recommended, the records do not indicate the Plaintiff received it. Further the bone scan in June 2006 was negative. The ALJ points out that "the claimant did not report back pain to Dr. Rabinowitz during the consultative exam in August 2006. His motor strength, sensation and reflexes were normal. Dr. Rabinowitz did not diagnose a back impairment." (Tr. 22). The ALJ also points out the Plaintiff did not complain of back pain to Dr. Kapp, his

treating orthopedist, Dr. Herrera, his primary doctor, Dr. Justiz, his treating neurologist, or to any doctor at the VA. "These doctors did not note the claimant had an abnormal gait, diagnose a back impairment, or restrict the claimant's activities due to a back impairment." (Tr. 22).

Dr. Bertram referred the Plaintiff to Dr. Colon, a neurologist, in August 2007, due to complaints of rightsided low back pain with radiation into the buttock and thigh to behind the knee and occasionally all the way down to the foot. The Plaintiff claimed this pain occurred usually after sitting for too long, but occasionally with walking. The Plaintiff also complained of some general aches and pains in the upper and lower extremities. The ALJ notes, however, that "despite these complaints, the claimant reported that he rode a bicycle 10 miles per day." (Tr. 22).

The ALJ further notes:

> the claimant's report that his back pain began around September 2005, is inconsistent with his reports to his treating and consulting sources. No treating or consulting doctor found objective clinical evidence of a severe back impairment. The claimant did not complain of low back pain or difficulty walking at the hearing on September 19, 2007 and the undersigned did not observe him to walk with an abnormal gait. The claimant did not allege limitations in activities due to back pain. His daily activities including strenuous exercises do not indicate that the claimant's back pain is more than mild in severity. The objective findings of MRI scans do not show the claimant has a severe back impairment and Dr. Colon did not diagnose such. No treatment was prescribed based upon the objective clinical findings. Dr. Colon did not restrict the claimant's activities based upon the exam and MRI findings.

Therefore, the ALJ found no clinical evidence of a severe back impairment, and articulated sufficient substantial evidence for discounting the Plaintiff's complaints of pain.

### *Upper Extremity/Chest and Arm Pain*

The ALJ points out that although the Plaintiff was examined at the VA on February 3, 2006, for complaints of left arm pain, his physical exam was essentially normal. There was good left

elbow range of motion, and no tenderness, redness, warmth, or swelling. (Tr. 27). The ALJ further cites:

> although there was traumatic atrophy of the triceps, muscle strength on extension was 4-/5+ and biceps strength was 5/5. Dr. Santucci found the claimant was "100 percent intact" neurologically with no radial, medial, or ulnar nerve damage, wrist or finger weakness, etc. There was no limitation of motion in the shoulder, elbow, or wrist and grip strength was 5+. Dr. Santucci stated the claimant had made incredibly excellent recovery from his wound and there was no objective neurological or muscle involvement or even joint involvement secondary to his injury. (Tr. 27).

The Plaintiff was admitted to the hospital on April 11, 2006, complaining of chest pains. He underwent stent placement. The ALJ points out that on April 28, 2006, the Plaintiff had no symptoms and his exam revealed normal heart and lung sounds. His hypertension was noted as under good control. (Tr. 28). The ALJ states that on May 26, 2006, Dr. Herrera noted that Plaintiff had no chest pain, fatigue, cough, wheezing, joint pain or swelling, weakness, etc. (Tr. 28).

In regard to the Claimant's history of left upper extremity injury, the ALJ concluded that although here was a history of left upper extremity injury, the Plaintiff worked at the level of SGA for many years despite that condition. The ALJ points to the fact that the left wrist splint prescribed by Dr. Justiz, according to the Plaintiff, seemed to alleviate the let wrist symptoms during the day. Dr. Jusiz' findings in February 2006 were normal, biceps strength was normal, grip strength was normal and there were no neurological deficits. In fact, Dr. Justiz stated the Plaintiff had made "an incredible recovery from his injury and prescribed no treatment... and did not restrict the claimant's use of his left upper extremity...." (Tr. 32).

Although the Plaintiff complained in July 2006, to the VA doctor of constant left wrist and left elbow pain despite taking pain medications, the ALJ points out the Plaintiff rated his pain at that visit as only 1/10 severity. Further, Plaintiff reported that nerve testing had shown his condition

was worsening, but that statement is inconsistent with the reports from his other doctors. (Tr. 32).

An exam revealed "full range of motion of the left upper extremity, which was unchanged from prior exams and no change was made in his treatment. (Tr. 32). During a consultative exam in August 2006, although Plaintiff told Dr. Rabinowitz that he continued taking hydrocodone and he complained of cracking and locking in his left elbow, he did not report constant pain, dropping things, or limited use of his left arm. Dr. Rabinowitz's objective clinical left arm findings were normal. (Tr. 32).

The ALJ reiterated that "although, Dr. Kapp did not treat the claimant's left arm impairments, he stated on October 8, 2006, that claimant retained the ability to frequently lift and carry 11-20 pounds and occasionally 21-50 pounds. He could use his hands for repetitive grasping, pushing, pulling and fine manipulation. He could reach above shoulder level. The claimant complained of multiple symptoms to Dr. Herrera in November 2006, but not specifically left arm symptoms, and his exam findings were essentially negative. (Tr. 32-33).

The ALJ stated that "there are no medical records of evidence which show that claimant reported to any doctor he was unable to perform his job duties due to his left arm/hand impairments." (Tr. 33). Further, the Plaintiff's allegations that he did not have good grip strength on the left, he was unable to work overhead, perform repetitive motions, and perform upper body workouts with the left arm/hand were pointed out by the ALJ to be "inconsistent with the objective, clinical findings from treating and consulting sources, as well as the assessments by Dr. Kapp." (Tr. 33). The ALJ pointed out that Dr. Harrison found the Plaintiff's left elbow flexion was somewhat limited, but left wrist and shoulder motion was not. Reflexes and sensation were normal except for some decrease in pinprick sensation in the radial nerve distribution in the left hand and mild to

moderate left wrist dorsiflexion weakness." (Tr. 33). These objective findings, the ALJ stated, are the same as those found by the Plaintiff's treating sources. (Tr. 33).

The ALJ specifically stated he was giving little weight to the opinion of Dr. Harrison, a consulting source, as it appears primarily based upon the Plaintiff's subjective complaints and not upon objective, clinical findings. It is inconsistent with the findings from the Plaintiff's treating sources. The ALJ cautioned that the determination of disability is a matter reserved for the Commissioner and if indeed the Plaintiff is unable to fire a gun using his non-dominant left hand, as is pointed out by Dr. Harrison, this limitation alone would not preclude him from the performance of all SGA. (Tr. 33).

At the hearing in September of 2007, the Plaintiff alleged his left arm pain had increased during the past 2 years and he rated that pain at a lever of 9-10/10 despite taking hydrocodone. He alleged limited use of his left arm/hand. The ALJ found that "claimant's alleged level of pain and functional limitations of his left arm/hand are inconsistent with his wide range of daily activities, including strenuous exercising, and avid reading, as well as his reports to treating sources and their objective, clinical findings." The ALJ further found that "while the claimant has some functional limitations due to his left arm/hand impairments, they do not preclude all SGA. His pain is no more than mild to moderate in severity and it is well-controlled with his medication and splint." (Tr. 33).

### Knee Pain

The Plaintiff underwent total knee replacement surgery on March 18, 2005. (Tr. 26). Dr. Kapp, the Plaintiff's treating orthopedic surgeon, referred him for physical therapy on April 5, 2005. (Tr. 26). At that time, the Plaintiff did not require an assistive device and he reported his pain level as 3/10. Range of motion was 112-115 degrees. (Tr. 26). Right knee X-rays in June 2005

continued to show his prosthesis was in excellent position. (Tr. 26). The Plaintiff told Dr. Kapp on June 30, 2005, that his knee felt stiff by the end of the day. However, exam revealed minimal swelling, but no effusion, and good motion and stability. (Tr. 26).

In July of 2005, the Plaintiff stated he had good result from knee replacement in March 2005, and continued to use Celebrex for that. (Tr. 26). On August 15, 2005, Plaintiff complained of chronic knee pain to Dr. Kapp despite continuing to take Lortab. He denied other symptoms including chest pain, shortness of breath, etc. Dr. Kapp found he had no joint swelling and full range of motion of the extremities. (Tr. 26). On that same date, the Plaintiff told Dr. Justiz that his wrist symptoms were improved with wearing wrist splints at night and denied lower extremity symptoms. (Tr. 26). No treatment was prescribed. (Tr. 26).

During an examination by Dr. Kapp on September 19, 2005, the Plaintiff continued to complain of knee pain at the end of the day. Dr. Kapp found the "claimant's right knee had only a small amount of swelling and no definite effusion. His gait, back, motion and stability were good." (Tr. 26).

The ALJ also points to the June 18, 2006 examination notes of Dr. Kapp. The ALJ cites:

> The claimant continued to complain of constant right knee ache especially by the end of the day. Recent bone scan, x-rays and blood tests revealed no abnormalities. Exam showed only a small amount of swelling, but no localized tenderness and satisfactory motion and stability. The claimant's chronic knee pain was unexplained, but approximately 1% of total knee replacement patients continued with static complaints of pain. For that reason, Dr. Kapp stated the claimant was unable to work due to pain. Dr. Herrera also noted again on June 29, 2006 the claimant's exam revealed no joint pain or swelling, no weakness, no chest pain and no cough or wheezing. (Tr. 28-29).

Although the Plaintiff complained to Dr. Rabinowitz during a consultative examination on August 5, 2006 of chest pain and right knee pain, the ALJ points out:

his gait was minimally antalgic on the right and he did not use or need an assistive device. Range of motion was normal in all joints except It was reduced to 115 degrees flexion in the right knee. There was no joint spasms. There was crepitus and increased size of the right knee. Straight leg raising tests were negative. Grip strength was normal bilaterally and dexterity was not impaired. Sensation reflexes and motor strength were normal. He was right hand dominant. Dr. Rabinowitz found the claimant had no difficulty getting on or off the exam table and he was able to squat, but complained of knee pain. (Tr. 29).

The ALJ noted:

The claimant received physical therapy for the right knee from November 22, 2005 through January 24, 2006. Initially the claimant reported right knee pain all day, limited knee motion and reduced strength. At discharge, the claimant reported he was pain-free 8 - 10 hours during the day.... The therapist noted that his range of motion and motor strength were within functional limmits and he had no gait deficits. The claimant was discharged to continue using a TENS unit at home. Dr. Kapp examined the claimant again on January 30, 2006[,] when he complained of constant knee ache with feeling very badly by the end of the day. He stated he could not continue working even at light duty. (Tr. 27).

The ALJ points out the analysis of Dr. Kapp regarding Plaintiff's knee complaints at that time. Specifically, "Dr. Kapp found the claimant was getting around well and his knee had much less swelling, almost normal. There was good motion and stability and x-rays remained good. Dr. Kapp stated he found no cause for the claimant's continued pain, but he requested a bone scan." (Tr. 27).

The ALJ specifically discusses his findings regarding the Plaintiff's claim of right knee pain post total knee replacement surgery in March 2005. The ALJ reviewed the medical evidence as follows:

The claimant reported only mild pain to Dr. Kapp in April 2005 and he did not require an assistive device at that time. Dr. Kapp released the claimant to return to light duty work but the claimant reported in June 2005 that hhis knee felt stiff by the end of the day. Exam findings remained good. In July 2005, the claimant told his VA doctor that he had good results from his knee

36

replacement, but he complained to Dr. Kapp in August of 2005 of chronic knee pain despite continuing to take Lortab. Dr. Kapp again found his knee exam was good and advised the claimant to stop taking Lortab. In September 2005, Dr. Kapp continued to find the claimant's gait, motion and stability were good and he referred the claimant for aggressive strengthening exercises. Following physical therapy, the claimant again told Dr. Kapp that his knee did well during the day but he had pain at the end of the day. His exam findings were unchanged and Dr. Kapp stated he found no cause for the claimant's pain, but continued him on light duty work. The claimant told Dr. Bertram in March 2006 that he continued with right knee pain, but Dr. Bertram also found his knee was normal. Dr. Kapp stated in June 2006 that recent bone scan showed no abnormality and he could not explain the claimant's complaints of knee pain. He had satisfactory motion and stability. Based upon the claimant's complaints of pain, Dr. Kapp stated the claimant was unable to work. (Tr. 34).

Based upon this review of the medical evidence, the ALJ gave "little weight to this assessment even though it is from a treating source, as it is based upon the claimant's subjective complaints rather than objective, clinical findings. It is also inconsistent with Dr. Kapp's later assessments of October 2006. The claimant told Dr. Rabinowitz in August 2006 that he continued with right knee pain, but exam revealed no instability, inflamation or edema. The claimant did not need an assistive device and he had no difficulty getting on or off the exam table." (Tr. 34).

In further evaluation of the evidence, the ALJ states "in October 2006, Dr. Kapp assessed claimant could stand/and/or walk a total of 4 hours a day and sit a total of 8 hours a day. He could lift and carry significant weight frequently and occasionally and he could occasionally perform postural activities." (Tr. 34). The ALJ specifically indicates these assessments are not consistent with Dr. Kapp's prior assessment of disability. (Tr. 34).

During a consultative exam at the VA in November 2006, Dr. Harrison made no objective, clinical findings of Plaintiff's right knee, but he assessed his right knee impairment would make it difficult for the Plaintiff to drive long distances or long hours. The ALJ gives this opinion from a

consulting source "little weight as it is not based upon the objective findings." "No treating doctor has made such assessments and his opinion is inconsistent with Dr. Kapp's assessments." (Tr. 34).

The ALJ further remarks that Plaintiff told Dr. Justiz in November 2006, that he used a treadmill or a bicycle 3 to 5 times per week, which is inconsistent with his complaints of severe knee pain. At the VA in May 2007, the Plaintiff complained of bilateral knee pain but his gait at that time was normal. The Plaintiff testified at hearing in September 2007 that he has constant right knee pain even with pain medication. However, that allegation is inconsistent with his reported riding a bicycle 1 ½ to 2 miles at a time and walking 1 mile to visit his father. His reported chronic, severe pain is also inconsistent with his ability to read a book every 3 or 4 days. (Tr. 34).

After the exhaustive review of the record contained within his report, the ALJ finally concluded that:

> As for the opinion evidence, the undersigned gives little weight to the determination of state agency medical personnel that the claimant retains the residual functional capacity to perform the exertional demands of light work with unlimited use of his extremities and no postural limitations. They did not treat or examine the claimant and they did not have benefit of updated treatment records. More weight is given their assessment that the claimant has no severe mental impairment as that is consistent with the evidence of record. (Tr. 34).

Thus, the ALJ did an exceedingly thorough job in articulating his reasons why the Plaintiff's claim of disabling pain was simply not credible.

### (3) Whether the ALJ Assigned Appropriate Weight to the Plaintiff's Treating Source

The Plaintiff specifically argues the ALJ should have given the opinion of Dr. Kapp, the Plaintiff's treating physician, great weight. The Commissioner argues the ALJ properly considered the medical opinions and other evidence of record.

While substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician, unless there is good cause to do otherwise, ( Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir.1991); 20 C.F.R. § 404.1527(d)), the ALJ may discount a physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. Natale v. Commissioner, 2008 WL 227957 *6 (M.D. Fla. January 25, 2008). When a physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). There is no support for a contention that the opinion of a non-treating medical expert should be evaluated any differently than opinions of other physicians. Id. Furthermore, the weight afforded a physician's opinion depends upon the extent by which it is supported by clinical or laboratory findings and is consistent with other evidence in the record. Wheeler v Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence, supports a contrary finding, or is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, (11th Cir. 1991) (ALJ properly discounted treating Physician's report where the physician was unsure of the accuracy of his findings and statements); Morrison v. Barnhart, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. Schnor

v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987); Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986)

The ALJ is required to review all of the medical findings and other evidence that supports a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527 (e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527 (e).

After a thorough review of the record and an extensive discussion regarding his findings, the ALJ determined that the medial evidence simply did not support that Plaintiff's chronic pain was disabling.  Moreover, the other evidence of record did not support that Plaintiff's subjective complaints were disabling.  Although the Plaintiff claims that the ALJ failed to properly weigh the opinions of the treating sources, as is outlined in the previous section, the ALJ supported his findings with substantial evidence in the record.  Therefore, his determination should not be disturbed.

## *(4) Whether the ALJ Failed to Explore the Requirements of the Plaintiff's Past Relevant Work?*

The Plaintiff argues that given the fact he has both chronic pain and mental impairments, the ALJ's finding of his RFC was incorrect.  Given these impairments, Plaintiff was not capable of performing a full range o sedentary work.  (Plaintiff's Brief, p. 19).  The Government argues the evidence overwhelmingly supports the ALJ's RFC assessment of sedentary work and is consistent with Dr. Kapp's RFC assessment.

*(A) Past Relevant Work*

The fourth step in the evaluation process requires the ALJ to determine the plaintiff's residual functional capacity (RFC) and based on that determination, decide whether the plaintiff is able to return to his/her previous work. McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). The determination of RFC is within the authority of the ALJ and along with the claimant's age, education, and work experience the RFC is considered in determining whether the claimant can work. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)). The RFC assessment is based upon all the relevant evidence of a claimant's remaining ability to do work despite her impairments. Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); Lewis, 125 F.3d at 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)). The ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. Phillips, 357 F.3d at 1238. That is, the ALJ must determine if the claimant is limited to a particular work level. Id. (citing 20 C.F.R. § 404.1567).

After careful consideration of the entire record, the ALJ found that Plaintiff has the RFC to perform the full range of sedentary work. (Tr. 23). In making his finding, he considered all symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence. Further the ALJ also considered the opinion evidence in accordance with the requirements. (Tr. 17-35). As stated above in the exhaustive analysis of the Plaintiff's medical history, the ALJ found the Plaintiff's impairments did impose some limitation of function, but not to the extent alleged and not to the extent as to preclude the performance of all work-related activities. (Tr. 35). Because the ALJ supported his reasoning with substantial evidence in the record, the Court should not disturb his finding.

*(B) Whether the ALJ's Question to the VE was incomplete?*

The Plaintiff argues that, in this case, the ALJ failed to pose a standard hypothetical question, one outlining the Plaintiff's restrictions, but rather, had the VE merely classify Plaintiff's past relevant work.  (Plaintiff's Brief 19-20).  The Government argues that contrary to the Plaintiff's arguments, the ALJ did not rely on a hypothetical question to determine that Plaintiff could perform his past relevant work.  Rather, the ALJ relied on the vocational expert's classification of Plaintiff's past relevant work, which was consistent with the DOT's classification.  (Defendant's Brief p. 17).

After finding the Plaintiff retained the RFC to perform sedentary work, the ALJ had to determine if Plaintiff could perform his past relevant work.  Given his RFC for a full range of sedentary work, the ALJ determined that Plaintiff could perform his past relevant work as a mortgage broker.  (Tr. 35).  The VE testified that Plaintiff's past work as a mortgage broker was sedentary and specifically identified the Dictionary of Occupation Titles (DOT) code, #186.267-018, supporting that Plaintiff's work required sedentary exertion.  (Tr. 73).  The ALJ did not rely on a hypothetical question to determine that Plaintiff could perform his past relevant work, but rather, relied on the VE's classification of Plaintiff's past relevant work, which was found to be consistent with the DOT's classification.

It should be noted the ALJ did not have to obtain vocational expert testimony to determine whether the Plaintiff could perform his past relevant work.  Lucas v. Sullivan, 918 F.2d 1567, 1573 (11th Cir. 1990) (holding that vocational expert testimony is not required in cases where the ALJ determines the claimant can return to their past relevant work).  The description of the Plaintiff's former work as a mortgage broker in the DOT provided substantial evidence regarding the demands of Plaintiff's past relevant work and the ALJ's finding that Plaintiff described his work consistent

with the DOT's description, provides substantial evidence that he could perform this work as generally performed in the national economy. Because substantial evidence in the record supports the ALJ's conclusion, it should not be disturbed.

## CONCLUSION

Based upon a review of the record, the ALJ's decision and the respective memoranda of law, it is respectfully recommended that the ALJ did not err:(1)  in finding that the Plaintiff's psychological impairments were not severe; (2) in evaluating the Plaintiff's pain (3) in the weight assigned to the opinions of the treating sources in this case; and (4) in his exploring the requirements of Plaintiff's past relevant work, and his questions to the VE were incomplete.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The Decision of the Commissioner should be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** at Fort Myers, Florida, this __31st__ day of May, 2009.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE


Copies:  Counsel of record, MJCD